v. Sandra R. Peterson All right, Mr. Isaac, I see you reserved three minutes for rebuttal, and you can begin whenever you're ready. Thank you very much. Your Honor, my name is Brian Isaac. I represent the plaintiff appellant, as you know. This is a very, very unusual case, factually, obviously. There are plenty of cases that come before this court and the other courts dealing with exacerbation of pre-existing injuries or the activation of latent quiescent conditions under the, quote, eggshell skull doctrine. But this case has a twist to it, in fact, there's a couple of twists to it. First, this is a case where the plaintiff's injuries occurred right after a very, very major surgery performed by Dr. Rue. That was the fourth surgery, which was designed to essentially correct the medical error that occurred previously with respect to the length of the screws, which were too small. According to everything I can see in this record, the plaintiff was making a good recovery. Dr. Rue said that his surgery was so effective that the- I don't understand why you're saying it's such an unusual case. This is a, in cases like this all the time, you have experts on each side who disagree as to causation. Government had an expert, a qualified expert, I think you would agree, the qualifications were, there was no objection to qualifications. There was no Daubert motion who testified that the additional back surgeries were not caused by the accident. So you can explain to me why I'm incorrect in thinking this. We would have to find that that doctor's testimony was implausible as a matter of law, that simply could not be credited in order to reverse the decision here, or am I missing something? I think you are, and let me tell you what I'd like you to look at, and I'm going to actually give you the page references. Okay. See, the problem here is that that doctor, Dr. Bichurk, I hope I'm pronouncing his name correctly, never did a physical examination. The district court, as you know, found that there were soft tissue injuries that took place for six months and awarded $180,000 in damages, which is not insubstantial. I view Dr. Bichurk's testimony specifically in pages 874 to 876 as being actually supportive of the plaintiff's claims. Because the evidence of trial showed that while MRIs are diagnostic for lesions, they're not necessarily diagnostic for pain. You can't look at an MRI and say this person has pain, this person doesn't have pain. You can see that there's a lesion, but the evidence also shows that you can have lesions which are not symptomatic. There are plenty of people who have herniated discs who don't have pain, and there are people who don't have herniated discs who do have pain. I think that Dr. Bichurk's response to Mr. O'Dell's cross-examination on 874 to 876 is what seals the deal, and that's what I'd ask you to look at. Let me read it, starting on page 17. And it goes general, specific, specific, specific. Question, starting on line 17. Well, my recollection is that you said that, but I'm going to ask you this. Would you agree with me that if Matt Consoport had a cervical spine that was, say, that of a 65-year-old person on June 2, 2017, would you agree that that age type of cervical spine would be more vulnerable than a cervical spine of a 20-year-old or a 30-year-old? Would you agree with me? Answer, yes. Age presents a worse prognosis for any trauma anywhere on the body. More specific question on 875, starting on line two. Question, and if Matt Consoport had the cervical spine of a 65-year-old person on June 2, 2017, you would agree with me that that cervical spine could be more potentially prone to injury or reinjury depending on what happened to it during the course of an event, right? Answer, yes. If you transplanted a 65-year-old's neck into his, yes. It would have been more susceptible to injury, which is exactly what the eggshell skull doctor did. But counsel, I don't know that there's a dispute as to whether he was more susceptible as opposed to whether the accident actually caused a re-aggravation of that susceptibility as opposed to a new and separate and relatively contained soft tissue injury. Right, and I think that that's right, but what the doctor says in the next question, which I'm going to read to you, I think answers your question, because it deals with bone, it deals with tissue, it deals with ligamentous injury. We know we have an injury to the clavum ligamentous and the retrosthesis. This is the next paragraph, question on 11. Question, it would have been yeah, because what happens with respect to an older person's neck with age, that makes it more susceptible to injury, tell us what happens. And here's his answer. Bone density can, we discussed it, decrease. So you're more susceptible to fracture or frank instability, so we have bone. Basically, everything becomes less flexible as you age. And- Just to go back to Judge Muir's question, he ultimately concluded that none of those things happen here. Those are all possibilities of things that can happen, depending on the circumstances. But looking at these circumstances, he's saying that's not what happened here. And let me just ask you a more narrow question. What piece of extrinsic evidence, medical evidence in the case, report, image, x-ray, MRI, contradicts his opinion? Well, I- He says that they are consistent with his opinion. You're saying, well, that wouldn't necessarily show, but there's not a single piece of extrinsic evidence in the record where you could say that contradicts his opinion. Well, but I think the problem with his opinion is that when you read those pages of the record, he's not disagreeing with what Dr. Ruth said. I'm not suggesting to you that there isn't a way to show pre-existing pathology. You can do it. The way most people do it is, they say, for example, Dr. Ruth's surgery failed. What about the fact that your expert never mentions the accident being a cause of the injury at any point until, at the deposition, I think it came up. And that was the first time, I think, that it was not indicated in any record, anywhere, that he or she believed that the causation was the accident. How do you address that? They can say some of the same things about your expert that you're saying about their expert. Well, there's a big difference. What I'm saying about my expert is that he's actually acting as a doctor and not acting as a lawyer. And when you read the government's brief, what the government says is he talked about multiple possibilities that could have existed. That's what doctors do. They wait to see what the sequela is, they wait to see what the future is, and then they make that diagnosis. Isn't this what we have trials for, that both doctors were cross-examined? All these alleged weaknesses in their views, the judge heard all of them, right? The judge heard it. I'm suggesting to you that the- Isn't that what trials are about? They generally are, but when an expert's opinion is such that it doesn't support the conclusion that ultimately- Why didn't you make a Daubert motion to exclude the expert completely then? If the expert's opinion was that bad, you should have made a Daubert motion, right? Well, you have to see what goes on in trial. I mean, it's not necessarily, you don't have to make a Daubert motion. You can examine the sufficiency of the evidence. Didn't you have a report? You knew what the conclusions were going to be, right? Sure, but you didn't know what the cross-examination was going to be. You didn't know he was going to make those specific concessions on his cross-examination. And I think what the problem here is that to say that this had no effect whatsoever, such that if there was no accident at all, that six months after the plaintiff would have had these catastrophic results, just isn't supported by any diagnostics, by any evidence at all. So the opinion is only as good as the underlying facts. All right, let me ask you a couple questions about the PTSD issue, because you're saying that was clear error. But the government, first of all, you said the government conceded that, but they point out their cross-examination of the therapist, Ms. Perel, that, Purcell, that it wasn't in her, she filled out forms for workers' compensation, there was no mention of PTSD. They also questioned her that depression and PTSD can overlap. So I didn't see any concession by the government that he suffered from PTSD. So why is that a clear error? I think what the government did, they didn't have their own expert, and now Dr. Bajork testified about it. There was overwhelming evidence that before the accident, he was getting ready to start his new life. He was going to start working. He had actually spoke with his former employer, and he had an office. And then afterward, his mental condition went way downhill. The fact that she didn't mention PTSD on her report doesn't detract from the efficacy of what his condition was, as testified to by him, as testified to by his wife, and as set forth in her own records. So- If the PTSD was caused by the additional back surgeries, if we agree with them that the district court didn't make any improper finding with respect to causation, it wouldn't be recoverable anyway, right? If the PTSD is because of his immobility due to the two additional back surgeries, if the causation finding is correct, you wouldn't be entitled to anything on that, right? Well, if I can, Judge Bianco, I don't think that's correct for this reason. The district court didn't make no award. It did make an award. As I read the district court's decision, it said that the plaintiffs had soft tissue injuries from the period of June to December, which is the point in time that- I made an award for the physical pain and or mental suffering associated with the soft tissue injury. But I'm suggesting to you, to the extent that the suggestion was that the PTSD was caused by the surgeries, or the award should have been hired because of that, if the causation finding is right, that's not correct. But I think if you have causation for six months, then you have causation for six months as well with respect to the PTSD. All right, thank you. Thank you. I'm sorry, Mr. Isaac, we do have Ms. Peterson's counsel here, and I'm confused. It seems like you have no challenge to the verdict with respect to Ms. Peterson. No challenge whatsoever. All right. All right. Got that cleared up. Thank you, your honor. I just want to confirm I represent Ms. Peterson and- I'm sorry to have stolen your time there, but I- That's okay, I just want to confirm that her decision gets affirmed based on that statement. Well, there were no arguments in the briefs challenging the verdict, and he just confirmed that, correct? I did, your honor. We have no claim against her. Thank you, your honor. It's nice to see you. Yeah. Thank you. If you want, we'll give you those two extra minutes or so, whatever it was. It's okay, your honor. Good afternoon, your honors. May it please the court, Nate Putnam for the government. I was lead counsel for the United States in the trial court below. And the judgment in this case should be affirmed. I want to emphasize two quick points. The first is that the eggshell skull rule is simply not implicated in this case in the way the plaintiff suggests, because Judge Artson found as a factual matter after a two-week trial, the plaintiff's pre-existing condition, which was chronic cervical disc disease, that that was not worsened by the accident, right? She found that he only suffered a temporary soft tissue injury lasting roughly six months. And the idea that Judge Artson somehow overlooked the eggshell skull rule or misapplied it is simply not consistent with her opinion because she framed, in her opinion, the key issue at trial to be whether or not plaintiff's pre-existing condition was worsened. She simply didn't agree as a factual matter. So her entire opinion really does rest on a correct recitation of the eggshell skull rule, even if she doesn't use the phrase. And she charged the advisory jury on, again, it doesn't say eggshell skull, but she charged the advisory jury on pre-existing conditions and aggravation, right? Yes, your honor, she did. And the second point I'd like to make is simply that the plaintiff's cannot show any clear error in this case with respect to Judge Arnton's factual findings because she had every right to credit the testimony of the government's expert, Dr. Bierke, over the testimony of plaintiff's treating physician, Dr. Rue. And in our briefs, we set out all the many reasons why we think she got it right in this case. But the narrow question for this court is simply whether Dr. Bierke presented a plausible view of the evidence in his expert analysis. And we think he clearly did, right? He performed exhaustive imaging analysis that compared plaintiff's pre-accident imaging and his post-accident imaging. He testified that they really showed identical spines, that there was no change to plaintiff's pre-existing cervical disc disease. And he explained that had the accident worsened his pre-existing disc disease, that some evidence of that would have shown up in the images, it simply was not there. And whether there's other ways to look at this evidence is just simply not relevant, right? So you want to address, Mr. Isaac, red portions of the cross-examination. I think he's arguing, suggests that doctor, in essence, was agreeing with his expert. You want to address that? Yes, your honor. To be honest, I didn't understand all of it with respect to the 65-year-old neck. But I will say that Dr. Bierke, on redirect examination, confirmed that no new information that was offered to him during the lengthy cross-examination of Dr. Bierke caused him to change his opinions, by which he continued to stand. So I know in their briefs, they also note that there's, you know, they argue that there's certain information or facts that Dr. Bierke didn't understand, whether it be the plaintiff's neck being more vulnerable because it was akin to a 65-year-old, whether it be the mulch surface, the biomechanics of his fall. The reality is that there's no indication that any of that evidence was in any way necessary for or undermined Dr. Bierke's analysis, which was really just rooted in the imaging. Do you want to address the finding that there's no evidence of PTSD? Yes, your honor. So the only evidence really in the record to support the post-traumatic stress disorder was from plaintiff's therapist, Maude Berzel. She testified that he had post-accident certain symptoms characteristic of post-traumatic stress disorder. But the government, we specifically cross-examined her with a form she had filled out and submitted in favor of plaintiff getting social security disability benefits. That form was filled out in November 2017. This is several months in more than 11 appointments after the accident.  It clearly asks Ms. Berzel to set out all of plaintiff's disorders. The only one that she listed was persistent depressive disorder. We know that he had that pre-accident. That's in the record. And nowhere did she mention post-traumatic stress syndrome. Not only that, but nowhere did she even mention the June 2, 2017 accident. And again, this is 11 appointments after the accident. And at one point in the form, she even says that he has intrusive thoughts. It goes dash surgeries. It wasn't, at least according to the form, thoughts of sidewalks or the accident in this case. So, you know, in summary, we did cross-examine her on post-traumatic stress disorder. And we think that the record supported Judge Arterton's finding that plaintiff did not prove that he had post-traumatic stress disorder. And unless the court has any other questions, I just respectfully request that you please affirm. I don't think there are any other questions. Thank you. Thank you, Your Honors. All right, Mr. Isaac, you have three minutes. Thank you, Your Honor. Your Honors, I just want to be clear. I'm not suggesting to you that you revisit the district court's decision. Factually, that's just, that's not something that I'm asking. And that's not something that is going to be successful. My suggestion is that when you look at the testimony of Dr. Bajerke, it doesn't establish as a matter of law the ultimate conclusion for which he ultimately made those conclusions. And the reasons are that, again, I think that his concessions regarding what happens when somebody has a pre-existing pathology such as this plaintiff suggests that the notion that this had no effect whatsoever on a severely compromised spine, which was so compromised that at the end of the day it required a seven level fusion and six surgeries doesn't follow from the facts. I can say I'm a judge on the Second Circuit Court of Appeals. I'm not. So not everything that witnesses say are facts. And I would also point out with respect to the PTSD that my adversary's pointing out that he was afraid of surgeries is absolutely consistent with the underlying testimony of the therapist who said he was not only afraid to be outside, but he was petrified of having further surgeries and having further sequela from this. So we would ask that you reverse for those reasons. All right. Thank you. Thank you, everyone. We'll reserve decision. Have a good day.